Rivera Martínez, Juez Ponente
*639 TEXTO COMPLETO DE LA SENTENCIA
La Sra. Ana Marrero Arce presentó el 11 de agosto de 2003 escrito de apelación. Mediante el mismo, solicita la apelación de la sentencia dictada el 20 de junio de 2003 por el Tribunal de Primera Instancia, Sala Superior de San Juan, en el caso Antonio A. Ros Escalante v. Ana Marrero Arce, Civil Número KAL2000-0859. Dicha sentencia fue archivada en autos el 11 de julio de 2003.
En la señalada sentencia, el Tribunal de Primera Instancia estableció un plan de relaciones patemo-filiales, así como relaciones abuelo-filiales para la abuela paterna, a pesar de que ello, según alega la apelante, no fue solicitado por la parte apelada, el Sr. Antonio A. Ros Escalante, y de que éste reside con sus progenitores.
El 3 de junio de 2004, el Sr. Antonio A. Ros Escalante (en adelante el apelado), presentó el correspondiente escrito en oposición a apelación.
Contando con la comparecencia de ambas partes y por los fundamentos que habremos de exponer, resolvemos confirmar la sentencia apelada.
I
Las partes de epígrafe sostuvieron una relación consensual durante la cual procrearon a la menor Ana Paola Ros Marrero, nacida el 18 de julio de 1996. Desde la fecha del nacimiento de la menor, las partes por mutuo acuerdo, establecieron un plan de visitas y de pensión alimentaria. El 29 de agosto de 2000, como consecuencia de una diferencia en cuanto a la pensión alimentaria a satisfacer, el apelado radicó una demanda de alimentos ante el Tribunal de Primera Instancia. Posteriormente, el 14 de septiembre de 2000, el apelado presentó ante el tribunal, una “Solicitud de Custodia Compartida de la Menor Ana Paola Ros”. Igualmente presentó, moción solicitando orden para requerir información al patrono y para incluir parte indispensable. La misma era a los efectos de incluir como parte indispensable en el proceso de fijación de pensión alimentaria, al señor Edilberto A. Pagán Cardona, actual esposo de la apelante.
Así las cosas, el Tribunal de Primera Instancia, mediante resolución de 18 de septiembre de 2000, aprobó y adoptó las determinaciones de hechos y las conclusiones de derechos realizadas por el Examinador de Pensiones *640 Alimentarias a raíz de una vista celebrada el 14 de septiembre de 2000. En consecuencia, el tribunal le impuso al apelado la obligación de proveer una pensión alimentaria provisional de $304 mensuales, a favor de la menor habida entre las partes.
El 20 de septiembre de 2000, la Sra. Ana Marrero Arce (en adelante la parte apelante), presentó moción informativa ante el Tribunal de Primera Instancia mediante la cual expuso, entre otras cosas, el acuerdo llegado entre las partes con relación a las relaciones patemo-filiales, a saber:
Sobre la relación patemo-filial y sujeto a la buena salud de la menor.
Efectivo el sábado 16 de septiembre de 2000, el padre de la menor tendrá relaciones patemo-filiales con la menor cada fin de semana alterno desde las nueve de la mañana del día sábado hasta las 6 de la tarde del día domingo. El padre o los abuelos paternos recogerán a la menor en su residencia no más tarde del día y la hora indicada, y la entregaran a su residencia no más tarde del día y la hora indicada.
El 25 de septiembre de 2000, la parte apelante presentó ante el Tribunal de Primera Instancia, moción en oposición a que se incluyera como parte indispensable al Sr. Edilberto A. Pagán Cardona.
En esa misma fecha, el Tribunal de Primera Instancia determinó que la patria potestad de Ana Paola (en adelante la menor), sería compartida e incluyó como parte indispensable en el caso de epígrafe al Sr. Edilberto A. Pagán Cardona, emitiendo en consecuencia orden a Sears para que ésta proveyera la información solicitada sobre el señor Pagán. Así también, en dicha fecha, el apelado presentó ante el Tribunal de Primera Instancia moción urgente sobre relaciones patemo-filiales. En la misma, expuso que desde el 15 de septiembre de 2000, fecha en cjue presentó solicitud de custodia compartidá, la parte apelante impide que el apelado se relacione con la menor. Este, según alega, había ejercido la custodia compartida de la menor hasta ese momento, ya que se relacionaba con ella durante los fines de semana y servía de recurso de cuido durante los días de semana y no había vuelto a ver a la menor. Así, también, argüyó que durante el fin de semana anterior a la radicación de la moción, la madre alegó que la niña sufría de una infección de orina y que a raíz de ello, él se comunicó con el pediatra de la menor, el cual le indicó que la menor no estaba bajo su cuidado y que el récord revelaba que no había sido atendida recientemente. A esos efectos, según alega el apelado, se comunicó con la apelante la cual le indicó que su abogado, abuelo materno de la menor, le había instruido que el padre no podía relacionarse con la menor. Así las cosas, mediante dicha moción, solicitó que el tribunal señalara una vista urgente donde fijaran relaciones patemo-filiales de forma temporera.
El 26 de septiembre de 2000, la parte apelante informó al tribunal apelado de su intención de dejar sin efecto el acuerdo llegado entre las partes, sobre las relaciones patemo-filiales provisionales. Ello, según alegan, por razones de peso y por el bienestar de la menor.
El 4 de octubre 2000, el tribunal apelado ordenó a la Oficina de Relaciones de Familia a realizar un estudio social sobre custodia y relaciones patemo-filiales. El 3 de noviembre de 2000, la Trabajadora Social del Tribunal de Primera Instancia, la Sra. Elizabeth Linsky, citó a las partes para el 8 de diciembre de 2000. Así las cosas, la parte apelada fue entrevistada en varias ocasiones por los funcionarios de dicha oficina.
Posteriormente, el caso fue referido a la Dra: María Sainz, y ésta a su vez le refirió a la Dra. Doris González Torres (en adelante la doctora González) y al Proyecto Amanecer un alegado incidente de abuso sexual, para el mes de enero de 2001. Así las cosas, la doctora González entrevistó en dos ocasiones al apelado y en seis ocasiones a la menor. Durante la primera entrevista con el apelado, no estuvo presente la menor. No obstante, en la segunda ocasión, la menor estuvo presente y la doctora González pudo observar el proceso de relación entre ellos. 
*641 En la vista de 8 de noviembre de 2000, el tribunal estableció relaciones patemo-filiales, de 9:00 a.m. a 11:00 a.m., bajo la supervisión de la abuela paterna. 
El 9 de noviembre de 2000, la parte apelante ofreció al tribunal el testimonio de su testigo perito la Dra. María Sanz.
El 30 de marzo de 2001, la Trabajadora Social de la Oficina de Relaciones de Familia del Tribunal sometió su informe a la consideración del Tribunal. El 3 de julio de 2001, la Trabajadora Social informó al Tribunal que “tras recibir el informe evaluativo de la situación de la menor del Proyecto Amanecer” se reafirma en las recomendaciones contenidas en el informe presentado el 30 de marzo de 2001.
El 5 de junio de 2001, la parte apelante presentó ante el tribunal apelado moción urgente para expresar posición sobre informe de la trabajadora social .y solicitud de señalamiento urgente de “status conference”. En la misma, expuso que luego de haber leído el informe presentado por la Oficina de Trabajo Social del Tribunal, no se encuentran conforme con el resultado del mismo.
El 14 de septiembre de 2001, la parte apelada informó al Tribunal que utilizaría el testimonio de la Dra. Doris González Torres.
Así las cosas, el 30 de octubre de 2001, el Tribunal amplió las relaciones patemo-filiales a todos los domingos de 9:00 a.m. a 5:00 p.m.
Ante una orden emitida por el Tribunal de Primera Instancia el 30 de enero de 2002, el Departamento de la Familia Oficina de Administración de Familias y Niños, informó que el expediente original del Proyecto Amanecer, número 3293, en el cual constaban los hallazgos y evaluaciones de la Dra. González, se extravió. 
Finalmente, y tras varios incidentes procesales, se inicio el proceso de vistas en el caso de autos. La vista en su fondo comenzó con el testimonio de la Dra. María Sanz, testigo de la apelante y psiquiatra que atendió a la menor, para el mes de septiembre del 2000. La doctora Sanz, quien como indicáramos, entrevistó a la menor en cuatro ocasiones, expresó que la niña le indicó “que su padre le hacia cosquillas en la barriga y que le hacia cosquillas y señala el área vulvar”. La doctora Sanz arguye que la menor alegadamente le manifestó que la abuela paterna regañó a su papá, que el abuelo paterno le dio al padre y que éste se fue de la casa y ese día no durmió allí. Posteriormente, la doctora Sanz refirió el caso a Proyecto Amanecer, para tener una segunda opinión, ya que tenía sospechas de que se hubieran cometido actos lascivos contra la menor. Desde la primera visita, la doctora Sanz recomendó que la niña no se relacionara con el padre, ya que luego de las evaluaciones, concluyó que la menor había sido molestada sexualmente. La Dra. María Sanz indicó a esos efectos que las “cosquillas” en el “área vulvar” no son un asunto normal. Igualmente, indicó que los niños no saben lo que son actos lascivos y lo pueden ver como un acto de cariño. A preguntas del Tribunal, la doctora expresó que la menor le había manifestado que el incidente había ocurrido una sola vez. 
La segunda testigo fue la Sra. Ana Arce, madre de la apelante, quien se relaciona con la menor de dos (2) a (3) veces en semana por ser quien la lleva a las clases de ballet y al catecismo. La señora Arce indicó que para septiembre de 2000, instó a su hija a llevar a la menor al pediatra porque presentaba ardor en el área vaginal. Además, indicó que para el mes de junio de 2000, la menor sé tocaba su área genital y al preguntársele si le picaba, ésta le expresó que su papito la había apretado “duro, duró”. 
A la segunda vista testificó la apelante, Sra. Ana Marrero Arce, quien revalidó el testimonio de la abuela materna en cuanto al alegado incidente, y a preguntas de la parte apelada indicó que la menor llama “papito” al señor Ros Escalante, padre biológico de la menor, y “papi” a su padrastro, el Sr. Edilberto a. Pagán. Asimismo indicó que la menor tiene bien claras las figuras del padre y del cónyuge de la apelante. La apelante también *642 indicó que la menor, para la época del incidente, se quedaba a dormir en casa de la “abuela Teresa”, (abuela paterna), los martes, ya que ese era el día libre de la abuela y el día que ella la cuidaba. Indicó, además, que llevó a la niña al pediatra, ya que expresaba tener ardor en el área genital, que le hicieron unos urianálisis y que éstos resultaron negativos a infección de orina.
En la tercera vista, testificaron la Sra. Doris González, testigo de la parte apelada y la Trabajadora Social de la Oficina de Relaciones de Familia del Tribunal, la Sra. Elizabeth Linsky.
La doctora González testificó que el caso le fue referido por la doctora Sanz, quien había sido consultora del Proyecto Amanecer porque había sospechas de actos lascivos y que ella quería que la viera un profesional. Indicó que la doctora Sanz no le habló del caso y que de haber ésta validado el abuso sexual, no se lo hubiera referido a ella. La doctora González expresó que la niña “sólo muestra un incidente donde al parecer fue al baño y su padre la toca.” Igualmente indicó que la menor le hizo el relato de forma natural, que no encontró que la menor haya sido influenciada por nadie y que tampoco tiene aprendizaje vicario de terceras personas. La doctora González informó haber enviado los hallazgos del caso a la Trabajadora Social del Tribunal y un resumen del mismo. Ello, toda vez que el expediente del Proyecto Amanecer nunca apareció en el Departamento de la Familia. 
Según el testimonio de la doctora González, no existen pruebas psicológicas para descartar una agresor sexual. Recomendó que en casos como este, la menor no pernocte con el padre hasta que entrara en la etapa de latencia, o sea de 5 a 12 años. 
Posteriormente, testificó la Trabajadora Social del Tribunal, la Sra. Elizabeth Linsky. Ella expresó que utilizó la metodología de entrevistas individuales a la madre y a su esposo, al padre y a la menor, y visitó los hogares de ambos, la escuela de la menor y se comunicó con la doctora González y con el pediatra de la menor, el Dr. Severino Díaz. Testificó, igualmente, que como instrumentos de evaluación utilizó el genograma de las partes, el dibujo de la familia realizados por la menor, foto análisis y revisión y análisis de documentos como el expediente civil y el informe psicológico del apelado. 
La Trabajadora Social no refirió a las partes a evaluaciones psicológicas, expresando que para ello debe existir controversia legítima sobre el estado físico o mental de una persona. Recomendó relaciones patemo-filiales amplias, ya que no se validaron los actos lascivos del padre hacia la menor. A preguntas del Tribunal, indicó que recomienda las relaciones patemo-filiales porque no existe indicio de que el apelante cometiera actos lascivos contra su hija ni existe fundamento para que éste no se relacionara ampliamente con ella.
El Dr. José H. Rodríguez, perito psicólogo de la parte apelante, expresó en su testimonio que la doctora González le había expresado que no podía descartar que hubiese abuso sexual, pero que tampoco lo había validado. El doctor Rodríguez expresó que la doctora González le indicó que la niña la había manifestado que su padre la había tocado, pero ella había hecho conjeturas de que había sido mientras la bañaban. Además testificó, que al entrevistar al doctor Arismendi, éste le indicó que no recordaba para qué le fue referido el apelado y que no tenía el expediente, por estar retirado. Tras evaluar el informe del doctor Arismendi, el doctor Rodríguez informó al tribunal que no es una evaluación para un caso como el presente. Explicó que lo que procede en casos como éste, es hacer una evaluación integral con todos los familiares de la víctima, suministrarle pruebas de personalidad y trabajar con un protocolo dirigido al aspecto de abuso. Indicó, además, que no entró en la validación de los actos de abuso sexual para no victimizar aún más a la menor, la cual, según su testimonio, “está en proceso de recuperación”. El doctor Rodríguez no descartó que sucedieran los incidentes y recomendó que las relaciones patemo-filiales fueran supervisadas por períodos máximos de dos (2) horas.
Del testimonio del apelado, el Sr. Antonio Ros Escalante, se desprende que éste siempre vivió con sus padres. Que cuando fue a la entrevista con la doctora González, ésta le indicó “que aquí no hay nada y aquí no ha pasado *643 I nada, yo te voy a ayudarSolicitó al Tribunal que se le ampliaran las relaciones patemo-filiales, según lo estipulara la Trabajadora Social, un fin de semana si y un fin de semana no, así como compartir con la madre, la custodia de la menor. Igualmente, expresó que quien bañaba a la niña era la abuela paterna. Que las alegaciones en cuanto al alegado incidente, eran incorrectas.
Por último, testificó la señora Teresa Olga Escalante, madre del apelado. La señora Escalante testificó que recogía a la niña en casa de la abuela materna los viernes por la tarde cuando salía de su trabajo y la devolvía los domingos. Que también la cuidaba los martes, que era su día libre del trabajo. 
El 20 de junio de 2003, el Tribunal de Primera Instancia dictó la sentencia en el caso de autos y la misma fue archivada en autos el 11 de julio de 2003. En dicha sentencia, el Tribunal de Primera Instancia determinó que las partes en el caso de epígrafe son jóvenes responsables, serios, que aman a su hija y que le brindan credibilidad al Tribunal. Así, también, el tribunal determinó que la alegada infección por la cual se llevó a la menor al pediatra no guarda relación con las alegaciones,.ya que las relaciones del padre con la menor son excelentes.
A esos efectos, otorgó la custodia legal de la- menor a la Sra. Ana Nereida Marrero Arce, fijó la pensión alimentaria permanente en $304 mensuales y fijó las relaciones patemo-filiales.
Inconforme con dicha determinación, la Sra. Ana Nereida Marrero Arce acudió ante nos, mediante el escrito de apelación que hoy nos ocupa. Mediante el mismo, indicó que el Tribunal de Primera Instancia incidió en la comisión de tres errores, a saber: (1) que erró el tribunal apelado al considerar y ponderar que no existe una controversia legítima sobre el estado mental del Sr. Antonio Ros Escalante que ameritase someterle a una evaluación psicológica y siquiátrica ante los hechos alegados y por este negarse reiteradamente a ser sometido a ellas bajo la alegación de haber sometido una evaluación de forma voluntaria a la trabajadora social la cual no cumple con los criterios requeridos y ni siquiera para evaluar su capacidad como padre, (2) que erró al establecer un plan de relaciones patemo-filiales sumamente amplio, aún mayor que el previamente existente por acuerdo entre las partes, el cual según el testimonio de la trabajadora social se recomienda teniendo en consideración que el apelado reside con sus padres y aún así establece un día de relaciones abuelo-filiales en la semana escolar para que la menor pernocte en casa de la abuela, que no se especifica el día y que tampoco se provee nada para el momento en que el apelante deje de residir con sus padres. Como tercer y último señalamiento de error, la parte apelante indicó que el tribunal apelado erró al hacer su determinación tomando como base únicamente la evaluación y recomendaciones de la doctora González y darle total credibilidad a su testimonio, cuando ésta no tenía contacto con el informe desde hace más de (1) año, del cual tampoco pudo producir copia ni ser examinado por la parte apelante, obviando la necesidad que ello implica de someter a las partes a evaluaciones psicológicas y siquiátricas, para subsanar la ausencia de ese informe y poder emitir una decisión informada sobre todo ante la negativa del apelado a ser evaluado y cuando la ausencia del informe de la doctora González tiene el efecto de que no se pudo evaluar si dicho informe cumple o no con los criterios establecidos en la jurisprudencia y en la literatura normativa para la determinación de custodia de menores, ni el principio del mejor bienestar del menor y si adolece de evidencia científica, confiable y relevante a la controversia para sustentar sus recomendaciones.
II
Por estar íntimamente relacionados el primer y el tercer señalamiento de error, los discutiremos en conjunto.
Como primer señalamiento de error, la parte apelante plantea, entre otras cosas, que erró el Tribunal de Primera Instancia al considerar y ponderar que no existe una controversia legítima sobre el estado mental del Sr. Antonio Ros Escalante que ameritase someterle a una evaluación psicológica y siquiátrica ante los hechos alegados. Por otro lado, como tercer señalamiento de error, la parte apelante arguye que incidió el tribunal apelado, al hacer su determinación tomando como base únicamente la evaluación y recomendaciones de la doctora González y darle total credibilidad a su testimonio cuando ésta, entre otras cosas, no tuvo contacto con el informe desde hace más de un año. Veamos.
*644 En reiteradas ocasiones, el Tribunal Supremo ha expresado que le corresponde al tribunal sentenciador aquilatar la prueba testifical ofrecida y dirimir su credibilidad. En razón de ello, repetidamente ha establecido nuestro Tribunal Supremo que en asuntos de credibilidad de la prueba concederá gran deferencia a las determinaciones de hechos efectuadas por los tribunales de instancia. Pueblo v. Torres Rivera, 137 D.P.R. 630, 640 (1994). Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que, de ordinario, “sólo tenemos récord mudos e inexpresivos”. Pérez Cruz v. Hospital La Concepción, 115 D.P.R. 721, 728 (1984). Véase además, Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985); Trinidad García v. Chade, 2001 J.T.S. 10.
Así bien, las determinaciones del tribunal de origen no deben ser descartadas arbitrariamente ni sustituidas por el criterio del tribunal apelativo, a menos que éstas carezcan de fundamento suficiente en la pmeba presentada. Ello, ya que los foros recurridos están en mejor posición para evaluar la pmeba desfilada, pues tienen la oportunidad de ver y oír a los testigos declarar y, por tal razón, su apreciación merece gran respeto y deferencia. En ausencia de pasión, prejuicio, parcialidad y error manifiesto, y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o la pmeba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la-evidencia hecha por el foro recurrido. (Citas Omitidas.) Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 62-63 (1991). Es decir, es doctrina claramente establecida que un tribunal apelativo no intervendrá con las determinaciones de hechos ni con la adjudicación de credibilidad que haga el Tribunal de Primera Instancia, salvo que éste haya incurrido en pasión, prejuicio, parcialidad o error manifiesto. Véase López Vicil v. I.T.T. Intermedia, 142 D.P.R. 857, 864-865 (1997); Monllor v. Soc. de Gananciales, 133 D.P.R. 600, 610 (1995). En ausencia de pmeba en contrario, se presume la corrección de los procedimientos y determinaciones judiciales. Pueblo v. López Guzmán, 131 D.P.R. 867, 898 (1992).
De otra parte, conocida es la regla que establece que el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Figueroa Hernández v. Rubén del Rosario, 147 D.P.R. 121 (1998), Pueblo v. Montes Vega, 118 D.P.R. 164 (1986). Generalmente, la pmeba de los peritos contribuye al mejor entendimiento de los hechos que debe juzgar el tribunal, cuando están de por medio cuestiones técnicas o complejas, no siempre accesibles al conocimiento del común de los mortales. La pmeba pericial no sustituye ni puede sustituir los demás elementos probatorios de los que se nutre ordinariamente el proceso judicial. Por esta razón, como método auxiliar para la valoración de la pmeba y la resultante adjudicación de los hechos, los tribunales no estamos obligados a aceptar las conclusiones de un perito, en particular cuando las mismas son incongruentes con el resto de la pmeba o con la credibilidad que le hayan merecido otros testigos. De hecho, el Tribunal Supremo ha reconocido que los tribunales no estamos obligados a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la pmeba y hasta de descartar una opinión pericial aunque resulte técnicamente correcta. Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 623 (1970); Díaz García v. Aponte Aponte, 125 D.P.R. 1, 13 (1989). Además, el testimonio de un perito está sujeto a la misma norma de credibilidad aplicable a cualquier otro testigo.
La regla general en cuanto a la presentación de pmeba pericial ante los tribunales apunta, como indicáramos, a que: (1) el juzgador de los hechos no está obligado a aceptar las conclusiones de un perito; (2) los tribunales apelativos están en la misma posición que los foros primarios para evaluar y dirimir los conflictos entre las autoridades opuestas sobre controversias periciales médicas; (3) cuando la determinación de los foros de instancia se basa en pmeba pericial y documental, los tribunales apelativos están en la misma posición que los tribunales de instancia para evaluar y llegar a sus propias conclusiones de derecho; y (4) al cumplir con su función revisora en casos de impericia médica, la decisión de los foros revisores debe estar fundada en la pmeba vertida en el juicio por los peritos y en la pmeba documental. Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988).
Así, también, en innumerables ocasiones, el Tribunal Supremo ha reiterado la norma relacionada r.l peso de la *645 prueba y el valor probatorio del testimonio prestado du rante un juicio. Basta el testimonio de un sólo testigo con conocimiento personal de la materia objeto del litigio que le merezca credibilidad al tribunals para establecer cualquier hecho. Regla 10(D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(D). Miranda Soto v. Mena Eró, 109 D.P.R. 473, 481-2 (1980). Los hechos se establecen por el valor probatorio del testimonio del testigo o testigos que se presenten y no por el número de éstos. Regla 10(E) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(E). Mercado v. American Railroad Co., 61 D.P.R. 228, 232-3 (1943); Ballester v. Farm & Dairy Products, Inc., 58 D.P.R. 479, 481 (1941).). En ese sentido, el juzgador de los hechos puede muy bien descartar el testimonio de un testigo si no le merece crédito o credibilidad, aun cuando no haya prueba en contrario. Esta norma cobra mayor importancia cuando existen elementos altamente subjetivos en la prueba.
Por otro lado, cuando existe conflicto de prueba, corresponde precisamente al juez dirimirlo -particularmente cuando están en cuestión elementos altamente subjetivos-, debido a que fue éste quien oyó y vio declarar a los testigos y apreció su "demeanor". Por lo tanto, el tribunal a quo, indudablemente, está en mejor posición para aquilatar la prueba testifical.
A los fines de la evaluación de la prueba testifical por un tribunal apelativo, la existencia de prueba conflictiva no necesariamente implica error manifiesto que justifique intervenir con la evaluación de la prueba y adjudicación de credibilidad que hizo el juzgador de hechos. Corresponde a éste dirimir el conflicto en la prueba
III
Primeramente, en el caso de autos, el foro apelado tuvo la oportunidad de escuchar y adjudicar la credibilidad que estimó pertinente. Al así hacerlo, determinó que “en este caso no existe controversia legítima sobre el estado físico o mental de la persona cuyo examen se solicita. Se deben ofrecer datos y razonamientos que permitan al Tribunal decidir si ordena o no las evaluaciones pertinentes, razón por la cual meras alegaciones no bastan. Dicha facultad para ordenar un examen físico o mental es discrecional, que no debe ser ejercido livianamente”.
A esos efectos, cabe señalar que del testimonio de la trabajadora social del tribunal, se desprende claramente que luego de las evaluaciones efectuadas por ésta a las partes del caso de autos, concluyó que no era necesario hacerle evaluaciones psicológicas a los padres. 
Consideramos no intervenir con la determinación del Tribunal de Primera Instancia en relación con la determinación de no ordenar a la parte apelada a someterse a evaluaciones psicológicas y siquiátricas. Ello, ya que fue el tribunal sentenciados quien tuvo la oportunidad de ver declarar a los testigos, además de que la parte apelante no derrotó con sus alegaciones la deferencia de la que gozan las determinaciones de hechos del tribunal apelado.
Conforme a lo anteriormente expuesto, no modificaremos las determinaciones de hechos ni la adjudicación de credibilidad que hiciera el tribunal apelado con relación al estado mental del apelado.
Por otro lado, y como mencionáramos, la parte apelante indica que erró el tribunal apelado al hacer su determinación a base de las evaluaciones y recomendaciones de la doctora González y al darle total credibilidad a su testimonio.
Al aplicar la norma anteriormente expuesta a los hechos del caso de marras, relativa a la deferencia que se le debe impartir las determinaciones de hechos del Tribunal de Primera Instancia, y que a basta el testimonio de un sólo testigo que le merezca credibilidad al tribunal para establecer cualquier hechos, concluimos que no erró el foro apelado. Ello, ya que el tribunal sentenciador oyó y vio declarar a los testigos y apreció su “demeanor”.
Luego de haber analizado minuciosamente el contenido del expediente apelativo, el derecho sustantivo vigente y las transcripciones de las vistas celebradas en el caso de autos, concluimos que no se cometieron los *646 errores señalados. Los planteamientos esgrimidos por la parte apelante no nos mueven a modificar o alterar la determinación realizada por el Tribunal de Primera Instancia. Tampoco surge, ni se ha demostrado, que la determinación del Tribunal a quo estuviese matizada por pasión, peguicio, o parcialidad o error manifiesto en la apreciación de lá prueba.
En conclusión, el primer y tercer señalamiento de error no fueron cometidos.
IV
Por otro lado, como segundo señalamiento de error, la parte apelante plantea que el Tribunal de Primera Instancia incidió al establecer un plan de relaciones patemo-filiales sumamente amplio, aun mayor que el previamente existente por acuerdo entre las partes, el cual según surge del testimonio de la trabajadora social se recomienda teniendo en consideración que el apelado reside con sus padres y aún así establece un día de relaciones abuelo-filiales en la semana escolar para que la menor pernocte en la casa de la abuela. A esos efectos, ia apelante expresa que en la sentencia apelada no se especifica el día, y que tampoco se provee nada para el momento en que el apelante deje de vivir con sus padres.
El Tribunal Supremo de Puerto Rico ha expresado que en casos como el de autos, el norte a seguir es si el dictamen llegado responde al mejor bienestar del menor. Este es el principio cardinal que debe guiar a los tribunales. Maldonado v. Burris, 154 D.P.R. _ (2001), 2001 J.T.S. 72; Sánchez Cruz v. Torres Figueroa, 123 D.P.R. 418 (1989); Nudelman v. Ferrer Bolívar, 107 D.P.R. 495 (1978); Centeno Alicea v. Ortiz, 105 D.P.R. 523 (1977); Marrero Reyes v. García Ramírez, 105 D.P.R. 90 (1976).
En todos los casos de divorcio, los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el Tribunal, en el ejercicio de su saña discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos; pero el otro cónyuge tendrá derecho a continuar las relaciones de familia con sus hijos, en la manera y extensión que acuerde el tribunal al dictar sentencia de divorcio, según los casos. Código Civil de Puerto Rico, Art. 107, 31 L.P.R.A. § 383.
La relación filial entre padres e hijos al relacionarse, es de rango constitucional y se extiende al progenitor que no tiene la custodia de los hijos menores de edad. Por tal razón, no puede privarse a un padre o madre de un menor su derecho a relacionarse con su hijo menor de edad, sin antes ser oído.
Para hacer esta difícil decisión, debemos resolver si dicho dictamen responde al mejor bienestar del menor, que es el principio cardinal que rige en estos casos. Sánchez Cruz v. Torres Figueroa, supra; Nudelman v. Ferrer Bolívar, supra; Centeno Alicea v. Ortiz, supra; Marrero Reyes v. García Ramírez, supra.
Para determinar qué tipo de decreto puede redundar en el mejor interés del menor, el juzgador de hechos debe examinar, entre otros, los siguientes factores: la preferencia del menor, su sexo, edad y salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia y la salud psíquica de todas las partes. Nudelman v. Ferrer Bolívar, supra.
Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en un asunto de tan extrema dificultad. Marrero Reyes v. García Ramírez, supra.
La decisión debe estar basada en un análisis cuidadoso, objetivo y sereno de las circunstancias, según cada casó, teniendo como único objetivo el bienestar del menor. Santana v. Acevedo, 116 D.P.R. 298 (1985); Perrán v. Corretjer, 113 D.P.R. 593 (1982).
*647 A esos fines, estamos conscientes de que la mayoría de los casos de familia están revestidos de un gran contenido emocional por plantear controversias de índole afectiva. Reyes Torres v. Collazo Reyes, 118 D.P.R. 730 (1987). Siempre que sea factible, los tribunales no deben dejar sin efecto una decisión sobre patria potestad y custodia de menores, sin tener el beneficio de la posición de las dos partes que se disputan la custodia o la patria potestad. Es conveniente que en estos casos, las decisiones sobre los aspectos fundamentales del pleito se tomen luego de una audiencia en corte abierta; de manera que las partes puedan participar no sólo a través de su representación legal, sino directamente, si fuera preciso. Id.
Los tribunales están facultados para conceder la patria potestad y custodia de forma compartida si las partes así lo convienen y dicha determinación protege el bienestar del menor. Ello requiere que se determine si existe mía probabilidad real de que la patria potestad y custodia compartida habrá de funcionar entre los ex-cónyuges. Al respecto, el Tribunal Supremo ha expresado:
“A tales efectos, el tribunal investigará si los padres poseen la capacidad, disponibilidad y firme propósito de asumir la responsabilidad de criar los hijos conjuntamente. Ello implica superar desavenencias personales, y por imperativo, sostener adecuada comunicación para adoptar aquellas decisiones conjuntas que redunden en beneficio y los mejores intereses del menor. En esta misión, el tribunal examinará si entre las partes existe un grado manifiesto de hostilidad y tensiones, — que lejos de ser pasajeras — sean sustanciales y si existe una probabilidad real de conflictos futuros que hagan inoperable el acuerdo. Torres, Ex-Parte, 118 D.P.R. 469, 482 (1987).”
Con relación al derecho que posee el padre no custodio a continuar relacionándose con sus hijos, nuestro Tribunal Supremo expresó en Sterzinger v. Ramírez, 116 D.P.R. 762, 775-779 (1985), lo siguiente:

“Por su naturaleza, el derecho a relacionarse con los hijos no ‘puede ser renunciado de modo pleno y absoluto por su titular; tampoco es susceptible de prescripción por no uso, ni puede ser objeto de transacción o de compromiso; debe ser ejercitado personalmente por su titular, y no cabe delegación en un tercero”....

Este derecho es de naturaleza personal y familiar de contenido afectivo. Su finalidad no es otra que la de favorecer y facilitar las más amplias relaciones humanas entre familiares. Se refiere a aquel derecho que corresponde naturalmente al padre o a la madre para comunicarse y relacionarse con aquellos hijos que por resolución judicial han sido confiados a la custodia del otro cónyuge.
La asociación de los hijos con sus padres, al mismo tiempo que reconoce el derecho de éstos a disfrutar de su compañía, desarrolla en los niños el afecto de los autores de sus días y contribuye a formar sus corazones en un ambiente de fraternidad paternal... No hay vínculo en la vida que pueda considerarse más sublime que aquél que nace de la relación natural de afecto y simpatía que normalmente se desarrolla entre padre e hijo, no importa cuál pueda ser la conducta moral o la raza, color, credo o posición en la vida, del padre o de la madre. Picó v. Mejía, 52 D.P.R. 728, 731 (1938).

El derecho a mantener relaciones con sus hijos es tan importante que los tribunales pueden regular las relaciones patemo-filiales, pero no pueden prohibirlas totalmente, a menos que existan causas muy graves para hacerlo. Un ex-cónyuge culpable, incluso por la causal de adulterio, no puede ser privado de ver a sus hijos. El derecho a las relaciones patemo-filiales debe entenderse lo más liberalmente posible sin escatimar el tiempo que el niño pueda estar con el progenitor que no lo tenga en custodia.

El derecho del padre o madre no custodio a relacionarse con sus hijos menores tiene la naturaleza de un derecho-deber de su titular, ya que está pensado y concebido no sólo para su propio beneficio, sino eminentemente en beneficio del menor. Durante la custodia física temporera en que el padre no custodio tiene el menor en su compañía, éste tiene deberes implícitos al ejercicio de su derecho: el de alimentarlo, dispensarle *648 una acogida cálida y trato afectuoso, cuidarlo con la diligencia adecuada y velar por su salud física y psíquica. Sterdnger v. Ramírez, supra.

Así, las relaciones patemo-filiales adecuadamente reguladas fortalecen los vínculos afectivos que aseguran los cimientos del compromiso que debe tener un padre de asistir a sus hijos en su desarrollo: “el derecho del padre a la compañía del hijo, aunque sea esporádica, no es mera derivación del bienestar del niño, sino parte también de derechos fundamentales que nacen de la paternidad, de nociones de libertad y justicia que una sociedad sujeta a limitaciones constitucionales no puede ignorar del todo”. Id.

Los tribunales, conscientes de su responsabilidad de velar por el bienestar de los menores y la protección de sus mejores intereses, cuando las partes no se pongan de acuerdo, o la estipulación alcanzada no beneficie al menor, determinarán la manera en que los progenitores continuarán las relaciones de familia con sus hijos después de la disolución del matrimonio.

Al dictar normas para regular los derechos de visita, el tribunal deberá asegurarse de que el padre no custodio pueda tener la compañía de su hijo fuera del ámbito del otro progenitor por cierto tiempo que, dependiendo de las circunstancias, podría ser desde unas horas hasta varios meses. El derecho a tener a los hijos en su compañía incluye, salvo circunstancias excepcionales, la facultad de trasladar al menor a su casa o al lugar donde resida temporalmente. Se debe permitir que el derecho a tener la compañía temporera del menor se ejercite de la manera más amplia y razonable posible, de acuerdo con las circunstancias y el bienestar del menor. Esto tiene el propósito de asegurar el derecho fundamental del padre o madre no custodio a la privacidad e intimidad en las relaciones familiares con sus hijos.

Al establecer el plan, el tribunal deberá tomar en consideración que el derecho del progenitor no custodio no debe interferir irrazonablemente con el del otro padre a tener una vida privada en la tranquilidad de su hogar. Al hacer el delicado balance de intereses, el tribunal debe inclinar la balanza del lado del bienestar del menor. Aparte de esto, no se debe permitir que cualquiera de los padres aproveche la custodia temporera para ejercer presión sobre el otro o manipular a los hijos para lograr ciertas ventajas u obtener la custodia sin previa determinación judicial. El tribunal podrá tomar medidas protectoras prudentes y razonables para conservar su jurisdicción sobre las partes y la controversia. ” (Citas Omitidas)
Por otro lado, el Artículo 152A del Código Civil, supra, prescribe que los abuelos tienen “legitimación jurídica” para solicitarle al tribunal de instancia el derecho a visitación y a relacionarse con sus nietos.
y
Es indiscutible que el mejor bienestar de los menores está en un hogar con ambos padres, siempre y cuando sea una relación estable y de armonía. Ese es el ideal. Lamentablemente, en una gran porcentaje de los casos, ello no se logra y es en estas ocasiones en que los Tribunales tenemos que asumir la difícil y delicada tarea de determinar con cuál de los progenitores están salvaguardados los mejores intereses de la menor tanto en el aspecto físico como en el emocional. En el caso que hoy atendemos, el Tribunal de Primera Instancia hizo una evaluación meticulosa de la prueba presentada de una y otra parte. La ponderación de cada uno de los aspectos presentados ante su consideración lo llevó a determinar que el mejor interés de la menor se ve protegido ampliando las relaciones patemo-filiales.
Luego de escuchar el testimonio dé los peritos y de las partes, el tribunal a quo determinó que el padre no custodio es afectivo con la menor y que mientras no había ocurrido el alegado incidente, se relacionaba como un padre normal. Así, pues, consideramos que el tribunal apelado fue muy cuidadoso en su análisis, por lo que concedemos completa deferencia a sus determinaciones de hechos.
El tribunal apelado, velando por el bienestar de la menor y la protección de sus mejores intereses, determinó *649 aumentar las relaciones paterno filiales. Ello, ya que entendió que la relación entre el padre y la menor era una normal y afectiva. Además del hecho de que la menor cuenta con siete años, edad en que la niña puede expresarse bien y tiene raciocinio. Por entender que dicha determinación se encuentra sustentada en la prueba presentada ante el tribunal, no intervendremos con la misma.
De otra parte, la apelante señala que él tribunal erró al conceder relaciones abuelo-filiales sin ello haber sido solicitado por la parte apelada y que, además, la sentencia apelada no especifica el día en que se deban dar las mismas.
De un examen de la transcripción de la prueba oral vertida ante el Tribunal de Primera Instancia, advertimos que del testimonio de la apelante, así como del apelado y de la Sra. Teresa Esacalante, se desprende que esta última cuidaba a la menor todos los martes, pues era el día libre de trabajo de ésta.
A esos efectos, y habiendo el tribunal realizado un cuidadoso análisis de todos los factores envueltos en el caso de epígrafe como, por ejemplo, la interrelación de la menor con su abuela paterna, concurrimos con la determinación del tribunal apelado al otorgarle un día a la semana a la abuela paterna para que ésta la recoja en la escuela y pernocte en dicho hogar hasta el otro día, cuando la regresará al colegio.
En cuanto al señalamiento de la parte apelante de que la sentencia apelada no dispone el día en que la abuela paterna recogerá a la menor, cabe señalar que de la prueba oral vertida ante el tribunal se desprende que la abuela paterna cuidaba a la menor los martes, ya que ese era su día libre en el trabajo. Por otro lado, la sentencia apelada a la página 18 en el inciso (b) dispone que “[d]tirante la semana, la abuela paterna podrá recoger la menor en su día libre a la salida del colegio. Esta pernoctará en este hogar y al otro día la regresarán al colegio. ”
Lo anterior responde la interrogante de la parte apelante en cuanto a que la sentencia no especifica el día en que la menor deba ser recogida por la abuela paterna.
Por último, en cuanto al planteamiento de la parte apelante de que la sentencia apelada no provee nada para el momento en que el apelante deje de residir con sus padres, cabe señalar que el Tribunal Supremo ha expresado que las determinaciones de alimentos y custodia de menores no constituyen propiamente cosa juzgada, ya que están sujetas a revisión judicial en el tribunal de instancia, si ocurre un cambio en las circunstancias que así lo justifique, siempre, claro está, tomando en consideración los mejores intereses y el bienestar del menor. Santana Medrano v. Acevedo Osorio, supra; Figueroa v. Del Rosario, 147 D.P.R. 121 (1998).
VI
Por todos los fundamentos de hechos y de derecho anteriormente expuestos, resolvemos confirmar la sentencia apelada.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2005 DTA 2
1. Véase Apéndice 1 del escrito de apelación.
2. Cabe señalar que la Dra. María Sanz entrevistó a la menor eh cuatro ocasiones a saber, el 20, 27 de septiembre y el 16 y 30 de octubre de 2000.
*650 3. Véase, Transcripción de la vista del 11 de abril de 2002 a la pág. 8, donde la doctora González indica al tribunal lo siguiente:

“Cuando hago la reunión del padre con la niña, la reunión del padre con la niña fue una reunión no de rechazo, no de ambivalencia, no de temor, de compartir. Una niña que no demuestra, en las entrevistas, ninguna reacción emocional, de las que uno busca cuando un niño ha sido victimizado y relata la victimización. Un niño puede relatarte un evento, que le sucedió y te lo contó. Un niño que ha sido victimizado sexualmente, que reconoce el evento como una victimización, no te lo cuenta como que esto pasó y se acabó. Ves en el contexto del relato ansiedad, muchos se tocan a sí mismos, otros tratan de tocar a uno. Los ve en la forma en que se mueven en la oficina, la ansiedad es el elemento... hay quien se sale de la silla y se sienta en el piso y empieza a coger cosas y empieza ...la niña lo relató en forma natural. ”

4. Véase Apéndice 41, folio 113.
5. A preguntas de la Leda. Pilar Pérez Rojas, la Trabajadora Social del Tribunal indicó que recomendó que las relaciones paterno-filiales fueran amplias.
6. La doctora González dirigió el Proyecto Amanecer por años y hasta el cierre del mismo.
7. Véase, transcripción de la vista celebrada el 11 de diciembre de 2001, a la pág. 20.
8. Es preciso indicar que luego de que la menor informa el incidente a la madre y a la abuela maternal, no se vuelve a relacionar con el padre hasta que el Tribunal establece, mediante orden de 8 de noviembre de 2000, paterno-filiales supervisadas de 9:00 a.m. a 11:00 a.m.
9. Véase transcripción de la vista de 30 de enero de 2002, a la pág. 20.
10. Véase, transcripción de la vista celebrada el 11 de abril de 2002, a la pág. 6.
11. Véase, transcripción de la vista celebrada el 11 de abril de 2002, a la pág. 7.
12. La doctora González expresó que al cerrar Proyecto Amanecer entregó el expediente del caso al Departamento de la Familia junto con otros 3,600 casos. La Leda. Jeannette Perea, de la Administración de Familias y Niños, compareció al Tribunal para informar que no tenía el expediente del caso.
13. Transcripción de la vista celebrada el 11 de abril de 2002, a la pág. 30.
14. La señora Linsky estuvo en casa de los abuelos paternos, hogar donde reside el apelado, por un período de cinco (5) horas según el testimonio del señor Ros Escalante. El tiempo de visita de la trabajadora social en casa de la apelante no excedió de media (1/2) hora.
15. Cabe señalar que el informe que el apelado le llevó a la trabajadora social no fue uno ordenado por ésta, sino uno llevado por el propio apelado y preparado por el Dr. Arizmendi, psiquiatra de Lajas. El informe más bien consistía en una evaluación de aptitud para empleo.
16. Véase transcripción de la vista celebrada el 11 de abril de 2002, a la pág. 51.
17. Transcripción de la vista del 11 de abril de 2002, a la pág. 49.
18. Transcripción vista 11 de abril de 2002, págs. 78-81.
19. El doctor Arizmendi es el siquiatra que realizó el informe que el apelado presentó a la Trabajadora social del Tribunal.
20. Véase trascripción de la vista celebrada el 11 de abril de 2002, a la pág. 78.
21. Cabe señalar que según el testimonio de la Sra. Escalante, el apelado y ella fueron a la escuelita de la menor el día de su *651 cumpleaños, el 18 de julio, para llevarle una canasta de flores y unos muñecos, fecha en que la menor estaba de vacaciones.
22. Vease, pág. 13 de la Sentencia apelada.
23. Véase transcripción de la vista celebrada el 11 de abril de 2002, a las págs. 42 a la 44.